STEPHAN A. BARBER (SBN 70070)
GREGORY M. GENTILE (SBN 142424)
ROPERS, MAJESKI, KOHN & BENTLEY
50 W. San Fernando Street, Suite 1400
San Jose, CA 95113
Telephone: (408) 287-6262
Facsimile: (408) 918-4501
Email: sbarber@rmkb.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES R. JOHNSON, TERRENCE SIMS, HEATHER SIMS, JOSLYN JOHNSON-BENNING, WILLIE BENNING, RICHARD GADDES, ROBERT HARTENSTEIN, DEB HARTENSTEIN, TODD D. SEVERIN, HANS P. SCHROEDER, STEVEN SCHNEIDER, MICHAEL BILICH, LANCE GODDARD, JOAN GODDARD, MICHAEL MOFFETT, MARIAN MOFFETT, JAMES M. ROSS, WILLIAM SCHNEIDER, and VALERIE SCHNEIDER<br><br>    Plaintiffs,<br><br>    v.<br><br>STEVEN L. MYERS dba MYERS ENGINEERING INTERNATIONAL, INC. and MYERS ENGINEERING INTERNATIONAL, INC.<br><br>    Defendants. | CASE NO. CV-11-00092 JF<br><br>**DECLARATION OF JAMES R. JOHNSON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**Date:** **June 24, 2011**<br>**Time:** **9:00 a.m.**<br>**Location:** **Courtroom 3, 5th Floor** |

I, JAMES R. JOHNSON, declare and state as follows:

1. I am one of the Plaintiffs in this action and I am a California resident, residing in the City of Palo Alto. I make this Declaration in support of Plaintiffs' Opposition to the Defendants' Motion to Dismiss filed with this Court. I have personal knowledge of the facts set forth in this Declaration, and, if called as a witness, I can and would competently testify to these

- 1 -

1   facts.

2       2.    I am a former shareholder of the company known as Vortis Technology Ltd.

3   ("VTL") a corporation duly organized under the laws of the U.K.

4       3.    I am also a co-founder of the California Corporation known as Myers-Johnson Inc.

5   ("MJI"). The other co-founder of MJI was Defendant STEVEN L. MYERS ("MYERS").

6       4.    Significantly, I conceived the concept of use of near field Antenna Array

7   Technology here in California after researching the market and viability of the product and

8   thereafter engaged in a partnership with Defendant MYERS for the development of that

9   technology that migrated to the brand "Vortis" thru my California contacts, my business

10  interactions here in California and with and through investors here in California. "The Antenna

11  Technology" as referenced in Plaintiffs' Complaint herein is, according to patent, referred to as

12  an "Interferometric Array" for which Defendant Myers promised to contribute his technology.

13      5.    I also negotiated the Technology Assignment Agreement ("TAA") dated

14  December 22, 2004 referenced in Plaintiffs' Complaint at paragraph 15 with MYERS. The TAA

15  was executed by MYERS following our negotiations. MJI's duly appointed legal counsel

16  executed this Agreement on behalf of MJI here in California. I was Chairman of the Board of

17  MJI at that time. Section 10 of the TAA states that the TAA would be deemed to have been made

18  in and construed pursuant to the laws of the State of California. (Attached hereto as Exhibit A is

19  a true and correct copy of the TAA which was executed by MYERS – I have requested that MJI's

20  Corporate law firm, at the time, seek and deliver a copy of the fully executed TAA). I am

21  informed and believe that an executed copy would be in the possession of Defendants. Plaintiffs'

22  claim in their Complaint that MYERS breached the TAA by failing to dutifully deliver and

23  support fully released and usable Antenna Technology for the benefit of the Corporation.

24      6.    MYERS was given stock in MJI as a consequence of executing the TAA. Further,

25  MYERS was also given, and thereafter held, the titles of "Chief Technology Officer" and "Chief

26  Science Officer" of MJI and was responsible for the development of The Antenna Technology for

27  the benefit of MJI and its shareholders, as further set forth below.

28      7.    Significantly, MYERS also entered into an Agreement entitled "Partnership

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

CASE NO. CV-11-00092 JF

DECLARATION OF JAMES R. JOHNSON RE OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1 │ Business Development and Technology Transfer Agreement" ("BDTTA") with me. This

2 │ agreement further reflects MYERS duties and responsibilities in supporting MJI in the

3 │ development of the Antenna Technology. The BDTTA also states at section 7.1 that it is

4 │ governed by and construed in accordance with the laws of the State of California. It was also

5 │ entered into in California for the benefit of MJI, a California Corporation. I executed this

6 │ agreement in California. (Attached hereto as Exhibit B is a true and correct, copy of the BDTAA

7 │ which was executed by MYERS – I have also requested that MJI's Corporate law firm at the time

8 │ seek and deliver a copy of the fully executed BDTTA). I am informed and believe that an

9 │ executed copy would be in the possession of Defendants).

10 │     8.    Pursuant to the TAA and the BDTTA, MYERS was responsible for the updating

11 │ and dissemination of all proper technical documents and information within the product

12 │ specifications and requirements, otherwise referred to as "the Product Model." The Product

13 │ Model was considered to be various models of antennas that could operate as an accessory

14 │ attachment to a portable handset or an embedded component both of which would need to meet

15 │ the basic, competitive operational requirements in the market for the product.

16 │     9.    As Chief Technology Officer for MJI, MYERS was responsible for implementing

17 │ the initial Product Model of the Antenna Technology. MYERS was also responsible for

18 │ developing for MJI the concept and design of the Interferometric Array (a new antenna) for

19 │ cellular devices and for providing marketing support for testing and modeling. In summary,

20 │ MYERS was responsible for the design, release documentation, instructions, testing,

21 │ manufacturing drawings, design rules, Gerber Files and the design program specific to the

22 │ technology he was developing for MJI. At all times, MYERS controlled the pace of the

23 │ development of The Antenna Technology during his tenure as Chief Science Officer and Chief

24 │ Technology Officer for MJI and thereafter for VTL. At all times MYERS was aware that each of

25 │ the above duties and responsibilities affected the development of the product and the viability of

26 │ both MJI and VTL. MYERS was equally aware that his failure to perform those responsibilities

27 │ would have a profound impact on MJI/VTL and its shareholders.

28 │     10.    Given the obligations assumed by MYERS under the TAA and the BDTTA, and

- 3 -

CASE NO. CV-11-00092 JF

**DECLARATION OF JAMES R. JOHNSON RE OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

his role as Chief Science Officer and Chief Technology Officer for MJI and thereafter for VTL, I and my co-Plaintiff shareholders relied on MYERS for his expertise, commitment, follow-thru and support in order to launch the product(s) that would embrace the Antenna Technology that MYERS was charged with developing for the benefit of MJI.

11. In furtherance of this development, I initiated what was called the "EU (European) Plan" which was a pending investment deal in the U.K. premised on the release and readiness of the product(s) that MYERS was developing.

12. Prior to entering into the UK Deal, and while in California, I assisted with the development of US Patent # 6,844,854 (for technology known as the "Antenna Technology") and worked with the law firm Choate, Hall and Stewart which assisted in procuring the patent for MJI.

13. The EU Deal came to fruition, in part, because of my efforts here in California which included, but was not limited to, working with the Federal Communications Commission, Wireless Bureau helping the hard of hearing. These efforts positioned MJI on the global map and ultimately lead to new developmental opportunities with Sony and Motorola here in California. These efforts increased the potential and the value of MJI, which in turn increased the support of MJI and its shareholders. It bears repeating that these actions were not taken in a void. It was MYERS' commitment, promises and representations made to me and to MJI's shareholders, and his undertakings for the benefit of MJI that ultimately lead to these efforts on my part and the shareholder support that followed.

14. The UK Deal ultimately led to the exclusive licensing of the Vortis patent to Vortis Technology Ltd., a new UK company borne from MJI. However, I ensured that the aforementioned patent remained here in California. Notably, during the negotiations and before the exchange agreement was completed, I negotiated that the patent **NOT** leave the California Corporation; but rather that instead a license agreement be procured between the California Company and the UK Company. In orchestrating and negotiating this international license agreement from California, with attorneys in both the United States and the U.K. I ensured that the Vortis patent remained with MJI and to this day, I contend MJI has a significant interest in the

CASE NO. CV-11-00092 JF

DECLARATION OF JAMES R. JOHNSON RE OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

same. That agreement called for termination of the assignment in matters of insolvency. Plaintiffs contend that discovery in this lawsuit will show a broken chain of ownership after the U.K. Deal was created.

15. During this time, MJI remained operationally inactive and operated as an accounting and as a support liaison to assist VTL in U.S. transactions. MJI's sole source of revenue was to be 1% of VTL's total revenue plus expenses. Notably, MJI was considered the California holder of technology as we were set to "launch" in the U.K. to execute the European Plan.

16. In furtherance of MYERS' responsibilities under the TAA and the BDTTA, MYERS was to support the EU Launch by delivery of timely, complete and accurate information to the "launch engineers" (many of whom were located in California) in support of MJI/VTL's product expectation and revenue goals. At all times MYERS was aware of these expectations and goals.

17. Significantly, during this time, sales activity in California was underway with two major customers; Sony and Motorola, as referenced above with each company having high expectations of product delivery for their respective customer base.

18. Following the commitments and representations of MYERS to MJI and its shareholders, and the relocation of business operations to the U.K., it became evident that MYERS was not performing as he agreed and as he had represented he would. For instance, MYERS repeatedly failed to timely and effectively communicate with design engineers; he failed to deliver product in a timely manner, failed to demonstrate technical capabilities of the product(s) and the necessary follow thru, failed to provide a clear development plan and to allay fears that the Antenna Technology was not meeting industry standards. In short, due to MYERS' failures and his lack follow-through and availability; he precluded an effective launch of product.

19. All of the above lead to the catastrophic failure toward the end of 2005 of the release process and ultimately the failure of the company that had profound effects on its shareholders here in California and in the United States. The product was tested in Nebraska, Ohio, Texas, California, Florida, Virginia and North Carolina collectively by this time and

CASE NO. CV-11-00092 JF

DECLARATION OF JAMES R. JOHNSON RE OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   everyone was led to believe by MYERS that his development of The Antenna Technology would

2   lead MJI/VTL to financial success.

3       20.     In summary, the concept was developed in California, patents were obtained in

4   California, and contracts were executed in California, all for the benefit of MJI and its

5   shareholders. Further, there was significant marketing, customer contacts, and presentations

6   made in California for the purpose of landing customer contracts. Moreover, significant

7   investments were made in this state, and elsewhere, all for the benefit of shareholders many of

8   whom are now Plaintiffs in this action. MYERS failures as set forth above have affected all of

9   the above.

10      21.     I understand that the Defendants desire that this Court dismiss this action, claiming

11  that Scotland, not California, would be the only appropriate forum for this action. As a Plaintiff

12  in this lawsuit, I disagree since the activities of MYERS here in California have impacted

13  shareholders of MJI and this California corporation. Furthermore, it would be burdensome,

14  oppressive and vexing for both me and the other Plaintiff shareholders named in this lawsuit to

15  prosecute or maintain our claims in a Scottish court for the following reasons:

16      (a)     First and foremost, the Plaintiffs' claims herein arise from the Contracts

17  executed in California by MYERS and the claimed breaches arising there under by MYERS, his

18  failure to develop the technology for the benefit of a MJI, a California Corporation and its

19  shareholders so as to bring the product to fruition. This ultimately led to the failure of VTL, the

20  insolvency proceedings that were instituted and the orchestration by MYERS to purchase the

21  technology for a fraction of its market value, all to the detriment of Plaintiffs herein.

22      (b)     Each Plaintiff would be required to travel to Scotland to present his or her

23  claims, to interview and select Scottish counsel (if one can even be located to prosecute this

24  action in that regard), and then work with Scottish counsel. There is an 8-hour time difference

25  between California and Scotland, which makes communications with counsel and others

26  problematic because the Scottish business day is essentially ending when the California business

27  day starts. Scotland is over 5,000 air miles from California, while the District Court in San Jose

28  is approximately 20 miles from my home in Palo Alto. I am informed and believe that the other

- 6 -

CASE NO. CV-11-00092 JF

DECLARATION OF JAMES R. JOHNSON RE OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   shareholders, in and outside of California share the same concerns and would also contend that it

2   would be burdensome, oppressive, and vexatious for them to prosecute their claims in Scotland.

3   Significantly, fourteen of the Plaintiff shareholders (which includes me) live in California with

4   many residing in or in close proximity to this District Court's Northern District.

5          (c)    There would be an enormous financial outlay for each of those Plaintiffs in

6   not only being required to travel to Scotland, but in remaining in that country for a lengthy and

7   complex trial. Not only would this require a substantial financial outlay by each of the Plaintiffs,

8   but would also result in loss of income from their respective employment. Again, it bears

9   repeating that fourteen of the Plaintiff shareholders (which include me) live in California with

10   many residing in close proximity to this District Court's Northern District courthouse.

11          (d)    The above financial burden would be heightened by the unfavorable

12   exchange rate that presently exists as to the U.S. dollar and the British pound.

13          (e)    There would also be the need for the Plaintiffs to agree upon and obtain

14   new counsel in the UK, if one could be located, which would be another significant expense and

15   potential obstacle to the Plaintiffs' prosecution of their claims. The prospective U.K. attorney

16   would need to become familiar with the complex issues in this matter. Presently, Plaintiffs have

17   an attorney, Stephan A. Barber, of the law firm of Ropers, Majeski, Kohn & Bentley in San Jose,

18   who is intimately familiar with the issues herein and is prosecuting this lawsuit on our behalf.

19          (f)    Should the Court dismiss this lawsuit as Defendants request, this action

20   will require Plaintiffs to re-file it in Scotland (a burden in and of itself). There would also be

21   further logistical impediments to overcome, including the need to monitor and assist new counsel

22   with his or her prosecution, some 5000 miles away. Further, it would also be burdensome to

23   communicate with new counsel in the U.K., especially given the fact that there are nineteen

24   Plaintiffs. It is quite conceivable these logistical impediments, when taken in total, would

25   dissuade U.K. counsel from agreeing to represent Plaintiffs. It also should not be overlooked that

26   the Defendants herein reside approximately 2,000 air miles from California, and in the same

27   country, rendering their having to defend this action in California significantly less burdensome

28   than having to do so in Scotland. Notably, the fact that MYERS executed an agreement (the

CASE NO. CV-11-00092 JF

DECLARATION OF JAMES R. JOHNSON RE OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   TAA) which requires application of California law and specifically states that it "shall be deemed

2   to have been made in, and shall be construed pursuant to the laws of State of California…without

3   regard to conflicts of laws" reflects MYERS' willingness to appear in California should a dispute

4   arise under the Agreement. I respectfully submit that any burden that the Defendants can

5   conceivably advance pales in comparison to the burden imposed on the Plaintiffs in having to

6   prosecute their claims in a Scottish court. Moreover, MYERS can hardly claim that having to

7   defend a lawsuit in California brought pursuant to the TAA was unforeseeable or that he could

8   not have anticipated having to defend a lawsuit herein in California.

9          (g)    Further, on information and belief, it is also my understanding that during

10  the normal course of business, Defendant does do business in California for other clients of

11  Defendant and travels to California for these other clients.

12         (h)    Moreover, the following witnesses are local or in close proximity to

13  California:

14         Jill Wehrli, California

15         Hans Schroeder, California

16         Mark Sanford, California

17         James Ross, California

18         Todd Severin, California

19         Toni Gitles, (resided in California)

20         Tomas Dayton, California

21         Graham Billingham, California

22         Patrick Mahoney, California

23         Joel Raymond, California

24         There are other witnesses as well such as Steven G. Coston, Technical Manager,

25  Regulatory Services, Sony Ericsson Mobile Communications who is also located in the U.S., as is

26  Tim Milam.

27         22.    As set forth above, Defendant MYERS had sufficient contacts with California to

28  satisfy the jurisdiction of this court and MYERS has admitted in his answers to Special

CASE NO. CV-11-00092 JF

1    Interrogatories that his business affairs are conducted by the other named Defendant, MEI.

2         23.    In short, dismissing this case in favor of a foreign forum could very well thwart

3    and discourage the Plaintiffs herein from prosecuting their meritorious claims and would

4    ultimately redound to the benefit of Defendants.

5         I declare under penalty of perjury under the laws of the United States of America that the

6    foregoing is true and correct.

7         Executed this _3_ day of June, 2011, in Palo Alto, California.

JAMES R. JOHNSON

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

# EXHIBIT "A"

# TECHNOLOGY ASSIGNMENT AGREEMENT

This Technology Assignment ("Agreement") is entered as of December 22, 2004 ("Effective Date") by and Between Steven L. Myers, Ph.D., P.E., (the "Founder") and Myers Johnson, Inc., a California corporation (the "Company").


RECITIALS

WHEREAS, the Founder has developed certain technology and intellectual; property relating to an interferometric array antenna commonly referred to as the Vortis.

WHEREAS, the Founder desires to assign to the Company, and the Company desires to obtain from Founder, ownership of such technology and intellectual property under the terms and conditions set forth in this Agreement (the "IP Contribution");

WHEREAS, the Founder has in connection with the formation of the Company contributed $12,500 in cash to the Company (the "Cash Contribution") and has been issued shares of Common Stock of the Company (the "Shares"); and

WHEREAS, the IP Contribution and the Cash Contribution are intended to be part of an overall transaction governed by Section 351 of the Internal Revenue Code of 1986, as amended, and constituting the first issue of stock be a commencing corporation within the meaning of Section 1595(b)(4) of Title 18 of the California Code of Regulations;

NOW, THEREFORE, in consideration of the mutual covenants and representations herein set forth and intending to be legally bound hereby, the Company and the Founder agree as follows:

1.    **Definitions**

For the purposes of this Agreement, the following terms will have the meanings ascribed to them as follows:

1.1    "Assigned Property" means the Copyrights, Patent Rights, Trademarks and Third Party Contracts.

1.2    "Copyrights" means specified as Vortis Antenna related copyrights, design rights, other artistic and literary rights and the like in and to the works described in Exhibit A, including, specified as Vortis Antenna related art work, designs, specifications, displays, user interfaces, documentation, and promotional materials as well as discrete modifications to any of the foregoing and the right to register any of the foregoing anywhere in the world.  Assignee shall provide a list of specified inclusions to this clause in Exhibit A.

1.3    "Patent Rights" means the patent applications and invention disclosures set forth in Exhibit B and all domestic and foreign patent applications therefor and all patents issuing therefrom (including, without limitation, all divisions, continuations, continuations-in-part, reexaminations, substitutions, reissues, extensions, and renewals) and the right to apply for any of the foregoing anywhere in the world.

1.4    "Proprietary Information" means, subject to Section 1.4 below, the specified Vortis Antenna related material, confidential or proprietary information, know-how, inventions (patentable or unpatentable), technology and trade secrets embodied, described or comprised in the Assigned Property or relating to the business operations of the Company as conducted or proposed to be conducted that exists as of the Effective Date or that is subsequently provided by Founder to the Company at his sole discretion, and that is not in the public domain or regularly disclosed by the Company to third parties without confidentiality restrictions, including design records, design rules, data, documents, CAD Files, components, fixtures, storage bins, Prototypes (as defined below), process plans, work orders, test papers, notes on papers and notebooks, CNC Codes and other information found in databases, files and discs or other electronic media that is related to the initial design and engineering of the interferometric antenna.  This also includes review papers, verification and validation papers (patterns reports scanned in the course of tuning, resultant changes based on patterns, Smith Charts, etc.) and reports, design changes, design refinements and design implementation requirements, information found in emails or other electronic media or paper.

1.5    "Antenna and Optimization Know-How."  Notwithstanding the foregoing, Founder retains all his right, title and interest in and to any know-how or processes related to Vortis Antenna design and production for optimizing antenna performance by means of controlling and adjusting particular variables and documentation thereof ("Retained Intellectual Property") and hereby grants the Company a non-exclusive, worldwide, perpetual, fully-paid license to such Retained Intellectual Property, with a right to sublicense for any and all purposes the Company so chooses so long as said licensing is within the goals and limitations of the business plan and patent coverage. Founder shall deliver copies of all documentation relating to such Retained Intellectual Property to the Company at such time as such documentation is prepared for training of technicians and artisans designated by the company.

"Third Party Contracts" means the contracts set forth on Exhibit C.

"Trademarks" means the names, marks, logos, and domain names set forth in Exhibit D and all rights and goodwill associated therewith, including the right to register any of the foregoing anywhere in the world.

## 2.    Assignment

The Founder hereby assigns to the Company exclusively throughout the world all right, title and interest in and to the (i) Assigned Property and Proprietary Information other than the Retained Intellectual Property; (ii) certain Vortis Antenna related

precursors, portions and work in progress with respect to the foregoing and all <u>Vortis</u> inventions, works of authorship, technology, information, know-how, materials and tools relating thereto; (iii) certain Vortis Antenna related causes of action and enforcement rights for any of the foregoing including all rights to pursue damaged, injunctive relief and other remedies for past and future infringement or misappropriation of any of the foregoing, and (iv) certain Vortis Antenna related other intellectual and industrial property rights incorporated or embodied in, or related to any of the foregoing (collectively, the "<u>Intellectual Property</u>").

## 3.   Consideration

In consideration of the IP Contribution described in Section 2 and the Cash Contribution, the Company has issued the Shares.

## 4.   Further Assurances

4.1   The Founder agrees to assist the Company in legal ways to evidence, record and perfect the Section 2 assignments and to apply for an obtain recordation of and from time to time enforce, maintain, and defend the assigned rights. Such assistance shall include providing, and obtaining from the respective inventors, prompt production of pertinent facts and documents, giving testimony, execution of petitions, oaths, powers of attorney, specifications, declarations or other papers and other assistance reasonably necessary for filing patent applications, complying with any duty of disclosure, and conducting prosecution, reexamination, reissue, interference or other priority proceedings, opposition proceedings, cancellation proceedings, public use proceedings, infringement or other court actions and the like with respect to the Patent Rights.

4.2   If the Company is unable for reasons such as death or physical or mental incapacitation of Founder to secure execution of any document to which it is entitled under Section 4.1, the Founder hereby irrevocably designates and appoints the Company and its duly authorized officers and agents, as his agent and attorney-in-fact with full power of substitution to act for and on his behalf, to execute and file any such document or documents and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed or performed by Founder.

4.3   Company agrees to save harmless, Founder for any and all liability, cause of action, suit, litigation and the like arising from Company's actions on behalf of the Founder, or its enforcement of this agreement or its pursuit of the benefits extended under this agreement so long as such actions do not arise out of gross negligence, gross errors or gross material omissions from Founder.

## 5.   Confidential Information

5.1   The Founder agrees not to use or disclose anything assigned to the Company hereunder or any other technical or business information or plans of the Company, except to the

extent such Founder (i) can document that it is generally available (through no fault of such Founder) for use and disclosure by the public without restriction or confidentiality obligation, or (ii) is permitted to use or disclose such information or plans pursuant to the Proprietary Information and Inventions Agreement by and between such Founder and the Company dated as of October 2000. The Founder recognizes and agrees that there is no adequate remedy at law for a breach of this Section 5, that such a breach would irreparably harm the Company and that the Company is entitled to equitable relief (including, without limitations, injunctions) with respect to any such breach or potential breach in addition to any other remedies.

5.2 Company hereby grants Founder a non-exclusive worldwide, perpetual, fully paid license to use any assigned property for other endeavors unrelated and not directly competing with the Vortis antenna concept so long as the Company has not paid for such property to co-founder in the course of development and, if Company did pay for such property, the Company has been adequately compensated if the Company did pay for such property.

## 6.     Delivery of Prototypes

6.1 In further consideration of the Shares, Founder shall deliver to Company working prototypes of the Vortis antenna suitable for manufacturing and reproducible results (individually, a "Prototype" and collectively, "Prototypes") that meet the requirements of the hearing impaired market, and cellular telephone embedded market. Other prototypes shall be produced as additional opportunities present themselves in the cordless handset embedded market, the biomedical device embedded market and such other markets as the Company shall identify from time t time. Said prototypes may be produced for additional pay as agreed by mutual consent and controlled by market conditions whereas no pay shall be beyond actual time incurred by Founder. Founder hereby assigns to the Company exclusively throughout the world, all right, title and interest in and to the Prototypes as set forth by this agreement for specified material and property.

## 7. Warranty

The Founder represents and warrants to the Company that he: (I) was the sole owner of all rights, title and interest in and to the Intellectual Property, (ii) has not assigned, transferred, licensed, pledged or otherwise encumbered any Intellectual Property or agreed to do so, (iii) has full power and authority to enter into this Agreement and to make the assignment as provided in Section 2, (iv) is not aware of any violation, infringement or misappropriation of any third party" rights (or any claim thereof) by the Intellectual Property, (v) was not acting within the scope of employment by any third party when conceiving, creating or otherwise performing any activity with respect to anything purportedly assigned in Section 2, and (vi) is not aware of any questions or challenges with respect to the patentability or validity of any claims of any existing patents or patent applications relating to the Intellectual Property.

## 8.     Transfer of this Agreement

This Agreement is not assignable or transferable by the Founder without the prior written consent of the Company. Any notice, report, approval or consent required or permitted hereunder shall be in writing and will be deemed to have been duly given if delivered personally or mailed first class, registered or certified U.S. mail, postage prepaid to the respective addresses of the parties as set forth below (or such other address as a party may designate by ten (10) days notice). No failure to exercise, and no delay in exercising, on the part of either party, any privilege, any power or any rights hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right or power hereunder preclude further exercise of any other right hereunder.

Because the nature of this Agreement is based on the fact that the services of the Founder are not replaceable and cannot be replicated, it is the explicit directive of the Founders to reflect that in the event of the untimely death of either Founder, or his physical or mental incapacitation, all obligations due by him to the Company shall be terminated. Said termination, however, shall not affect any rights or privileges accrued during his relationship to Myers Johnson Inc. Said rights include, but are not limited to: shares, stock options, guaranteed board sitting and representation, and any other benefits made to or earned by the Founder. These benefits are automatically transferred in their entirety to the heirs and assigns of the deceased or incapacitated Founder by way of his testamentary disposition, or, in lack thereof, by the applicable Estate and Inheritance laws governing his estate.

## 9.     Severability

If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

## 10.     Applicable Law

This Agreement shall be deemed to have been made in, and shall be construed pursuant to the laws of the State of California and the United States without regard to conflicts of laws provisions thereof. The prevailing party in any action t enforce this Agreement shall be entitled to recover costs and expenses including, without limitation, reasonable attorneys' fees.

## 11.     Terms and Confidentiality

The terms of this Agreement are confidential to the Company and no press release or other written or oral disclosure of any nature regarding the compensation terms of this Agreement shall be made by Founder without the Company's prior written approval; however, approval for such disclosure shall be deemed given to the extent such disclosure is required to comply with governmental rules. Any waivers or amendments shall be effective only if made in writing and signed by a representative of the respective parties authorized to bind the parties.

The parties agree that this Agreement is the complete and exclusive statement of the mutual understanding of the parties and supercedes and cancels all previous written and oral agreements and communications relating to the subject matter of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first indicated above.

FOUNDER

By: _signature

Name:  Steven L. Myers

Title:    Chief Technical Officer

Address:  5425 NW 24th St
Unit #202, Margate Fl, 33063

COMPANY

By:    signature

Name:  James R. Johnson

Title:    President

Address:  1275 Columbus Ave.
San Francisco, CA

# EXHIBIT A
# COPYRIGHTS


**[DESCRIBE SOFTWARE, GRAPHIC DESIGNS, ETC.]**

# EXHIBIT B
# PATENT RIGHTS

| Patent Applications | | | |
|---|---|---|---|
| Attorney Docket No. | Filing Date | Title | Inventors |
| 10/117, 777 | 4/5/2002 | interferometric antenna array | Steven L. Myers, PhD. |
| | | | |
| | | | |
| | | | |

| Invention Disclosures | | |
|---|---|---|
| Disclosure Date | Title | Inventors |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT C
# THIRD PARTY CONTRACTS

[LIST CONTRACTS, PARTIES AND DATES]

I suggest we use the Engineering Design Procedure to itemize the deliverables and necessary documents.

**EXHIBIT D**
**TRADEMARKS**

| Trademarks | | | |
|---|---|---|---|
| Mark | Serial Number | Country | Registration Date |
| | | | |

**[LIST DOMAIN NAMES, OTHER NAMES/BRANDS USED]**

# EXHIBIT "B"

# Partnership, Business Development and Technology Transfer Agreement

With reference to the Letter of Intent dated 12/11/00 and revised 01/04/01, the following agreement is executed between James R. Johnson (Johnson) and Dr. Steven L. Myers (Myers), each having mutual cause to develop a new technology for creating a unique antenna focused on near field nulls while operating on the cellular phone system. This agreement, once signed by both parties, shall be assigned to Myers Johnson Inc. in consideration for an exchange of stock and/or money as outlined below.

## Purpose

The purpose of the agreement is to outline actions, responsibilities and investment requirements of each party in developing, patenting, selling, manufacturing and distributing a specialized interferometric array antenna herein referred to as "The Vortis." It is the belief of both parties that considering the myriad of competing elements for antenna performance, hearing aid compatibility, health and manufacturing costs, the Vortis, with its superior ability to passively control near field energy levels, provides a compelling argument as the best overall solution for mitigating hearing aid interference and RF field levels at the head while improving overall performance of cellular phone handsets.

The names and addresses of the two parties are:

James R. Johnson
13 Horten Court
Pleasant Hill, CA, 94523
650 595 8888

Dr. Steven L. Myers
5425 N.W. 24th St. #202
Margate, Florida 33063
954 345 5000 ext. 101

## 1.0 Business Plan & Business Model Approval

1.1. James R. Johnson (Johnson) and Dr. Steven Myers (Myers) have read and agreed with, to the best of their ability and understanding, the general markets, business opportunity and business development plan outlined in Myers Johnson Inc.'s Business and Financial Plan (referred to herein as the Business Plan). This plan is revised regularly as appropriate and approved in accordance with ISO 9000 (revision 2000) standards. The Business Plan consists of:

1.1.1. Executive Summary, (current revision released 110904)
1.1.2. Business Plan (current revision released 101904)
1.1.3. Financial Plan (current revision released 111404)
1.1.4. Capitalization Plan (current revision released 111704)
1.1.5. Exhibits and reference documents (various)
1.1.6. Other instruments that support the plan (see Business Plan Appendix)

1.2. Other documents subject to this agreement are (see Engineering Procedure)
1.2.1. Marketing Requirements Document
1.2.2. Technical Specifications
1.2.3. Various Technical Documents (sent between Myers and Johnson)
1.2.4. Product Documents as described herein.

1.3. Johnson is responsible for updating and disseminating the business plan. This and other responsibilities fall within the job description of Chief Executive Officer. MJI's Business Model is considered to be an "Engineering, Sales & Marketing Firm" and must meet basic, competitive operational requirements in the market.

## 2.0 Product Plan & Product Model Approval

2.1. Johnson and Myers have read and approved the Marketing Requirements Document and Technical Specifications. To the best of their ability and understanding Johnson and Myers approve the technical considerations surrounding the development of an imbedded antenna and an accessory antenna for various models of cellular phone handsets or other portable consumer wireless devices. Said specifications and supportive documents (referred to herein as the Technical Documents) are updated as required and appropriate in accordance with ISO 9000 (revision 2000 standards). Technical documents are found in various locations at Johnson's and Myers' offices and shall be consolidated as required to implement and support the business plan. Myers is responsible for the update and dissemination of proper technical documents and information within the product specifications and requirements. This is referred to as the "Product Model." This and other responsibilities fall within the job description of Chief Technical Officer. Details of these responsibilities shall be outlined within an Engineering Process Procedure. The Product Model is considered to be various models of antennas that can operate as an accessory attachment to a portable handset or an embedded component both of which must meet basic, competitive operational requirements in the market.

2.2. The product consists of (Vortis technology only):

2.2.1. Design Documents, Manufacturing Drawings, Design Rules, Gerber Files and Design Program specific to the technology
2.2.2. Prototypes and previous iterations as well as design meeting notes and other forms of communication reflecting the development of this antenna.
2.2.3. Engineering Notes
2.2.4. Experiments and Tests
2.2.5. Research Data important for competitive information
2.2.6. Patent Rights
2.2.7. Other instruments and documents that support the integration of the antenna with consumer products named in the business plan.

## 3.0 Investment Requirements & Considerations

3.1 Having both agreed to support this project, Johnson and Myers shall each invest time and money of a limited undetermined amount as required to implement the Plan. Said time and money shall be recorded and available for review as appropriate. The purpose of each of Johnson's or Myers respective investments are as follows:

3.1.1. Johnson's investment shall focus on developing and implementing the initial Business Model as planned and raising the initial capital. This investment is limited to the delivery of a saleable business in support of the business plan. Additional work beyond this shall be contracted for under a separate contract. Additional work beyond this shall be contracted for under separate agreements as specified in section 6.7 herein.

3.1.2. Myers' investment shall focus on developing and implementing the initial Product Model as planned and financing the R&D. This investment is limited to the delivery of a saleable product in support of the business plan. Additional work beyond this shall be contracted for under separate agreements as specified in section 6.7 herein.

3.2 At times the respective investments may vary or resources may change with situations. A balanced accounting shall be maintained to reflect each others overall investment. It is the intent that both party's investment be adequate to meet the goals of the business plan. Where differences, delays or errors arise, both parties shall agree on how best to address compensation. In compliance herein, neither party's liability shall exceed the party's invested amount.

3.3 In consideration for the above support, both parties shall receive 50% of the issued shares upon formulation of the corporation known as Myers Johnson Inc. These shares shall be fully vested in the corporation upon the effective transfer of assets.

3.4 Having both agreed to the responsibilities in the respective positions, both agree to implement the Business and the Product Development plan using the best, most advanced means possible within their abilities. In consideration, each party shall work for MJI under a remuneration and payment schedule as agreeable to both. Notwithstanding this agreement, it should be noted that Myers has other interests which take away his time to support MJI. MJI shall take appropriate actions to place Myers in a part time position (30%) and ensure that a proper RF Engineer fill in MJI's RF engineering needs. This shall be executed after the product has been validated under MJI's Product Validation Plan and MJI is in a position to raise proper capital for this eventuality.

3.5 Both parties agree to maintain a timely schedule and commitment to this schedule in order to support the Business Plan and Product Development as outlined. Neither party shall take any action or restrain any action that is contrary to the proper development of the Business and Product Development Plan. This includes competing in any way with the intent of the business plan or purpose as of the date of this signing or mutually agreed revisions thereof.

**4.0 Patent Considerations**

4.1 The new antenna will be available to patent and Johnson and Myers will be equal owners of the patent and technology as evidenced by both names on the developmental documentation.

4.2 Myers shall be responsible for ensuring the patent has been clearly defined, and is unique and valuable to the body of knowledge in this area. Myers shall respond to all patent office actions that require technical insight.

4.3 The patent shall be assigned to the new corporation in exchange for stock in the company as defined in the deliverables.

**5.0 Terms & Conditions**

Johnson and Myers have mutually agreed to terms and responsibilities:

5.1 Myers shall develop the concept and design of the Interferometric Array (new antenna) for cellular devices for MJI and provide marketing support via testing and modeling. The fee for initial concept development and patent write up is $2,000. Additional funds shall be required to develop prototype(s) and additional iterations and revisions of the initial product. Myers is responsible for providing the design and prototype development capital until such time a launch has been implemented. Myers shall maintain an accounting of developmental time broken down so as to provide effective insight into the various cost factors and stations. Said work to be timely and scheduled in accordance with the time line of the business plan. Delays shall be communicated on a regular basis and made by approval only.

5.2 Johnson and team will provide capital for manufacturing designs and marketing for continued development and sale of the new antenna. Said working capital plans shall be identified in the Financial Plan.

5.3 Johnson shall address the capital required for patenting and Dr. Myers will work as required to support the patent team.

5.4 Johnson shall be responsible for marketing the product under communication controls as appropriate and agreed by both parties. Internal approval process and document control will ensure that no claims beyond the control of the CTO can be made.

5.5 Both parties shall provide operational support on a daily basis as required to implement MJI's business plan. This is set forth in section 6.7. Revenues from licensing fees, royalties and other benefits arriving out of the development of this antenna will be paid and enjoyed equally to both patent holders or the corporation that this technology is assigned to. Fees and benefits of Johnson and Myers shall be set by

reasonable comparisons under regular market conditions as agreed and approved by both parties. Details and specifics will be developed as appropriate. The goal for income from royalties is around 10% of cost of manufacturing or an amount not less than $1 for each accessory antenna sold which ever is higher. The goal of the cost of manufacturing for the accessory antennas will be less than $10 with an end user price of $69 after distribution costs and profits.

## 6.0 Warranties & Deliverables

6.1 Johnson or Myers can not warrant success of the technology, business and marketing plan beyond their own professional capabilities. However, both parties do warrant that they consider themselves leading professionals and that as such, do warrant to each other that the technology and the business and marketing plan shall be, as far as their professional opinion is concerned, the best technology and business and marketing plan necessary in order to achieve a sustainable competitive advantage as well as implement the business plan as produced.

6.2 If either holds information to the contrary of the above goals, this information should be identified clearly and immediately upon discovery of said information so that the other partner may take appropriate corrective action unless the issue is deemed reasonably resolvable within a reasonable time frame with no expected long term negative results to revenues or costs.

6.3 Both parties rely on each other to provide and support the goals of MJI and therefore shall give proper time to the development, approval and dissemination of information necessary to implement the business plans.

6.4 As part of the Technology Transfer both parties shall have the responsibility to turn over technology and business secrets necessary for the implementation of the business plan.

6.5 Johnson's deliverables are:
Business plan, business records, business research, business contacts, agreements and other instruments necessary for the effective implementation of the business plan. Deliverables shall fall defined within "best practices" under ISO 9000 standards.
NOTE: Best practices implies the reasonable use of resources and knowledge to achieve a competitive advantage.

6.6 Myers deliverables are (related to MJI's project only):
Antenna design plan, antenna prototypes used in experimentation, results of experiments, antenna test records and reports, antenna research (this design only), supplier contacts, related engineering notes and records. Deliverables shall fall defined within "best practices" under ISO 9000 standards.
NOTE: Best practices implies the reasonable use of resources and knowledge to achieve a competitive advantage.

6.7 Remuneration for Services:
Each party shall seek separate consulting/contractor agreements commensurate with the success of this plan after their deliverables have been satisfactorily presented. Activities requiring future deliverables shall be clearly defined and negotiated in good faith within any proposed consulting agreement. It is clear, that although neither party shall be made integral to the business during implementation of the plans, in the early phases, both parties are in integral part of the overall value and therefore must support this position.

6.8 Controls and Voting
Each party shall have a voting agreement and a mandatory board seat in order to ensure that neither party shall be positioned by shareholders or other board members in which said position can be adverse to either parties' personal controls over his existing or potential investment.
6.9 Hold Harmless
Any new company formed as a result of this agreement shall make agreement to save harmless, founders for any and all liability, cause of action, suit, litigation and the like arising from company's actions on behalf of the co-founder, or its enforcement of this agreement or its pursuit of the benefits extended under

this agreement so long as such actions do not arise out of gross negligence, gross errors or gross material omissions from co-founder.

## 7.0 Applicable Laws

7.1 This agreement will be governed and construed in accordance with the laws of the State of California with respects to corporation matters.

## 8.0 Severability

8.1 If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.


Agreement to this is made evident by signature and delivery by fax.

James R. Johnson                                    Dr. Steven L. Myers


Signed:_____ Date_____    Signed:_____ Date_____

# Appendix A
# Original Letter of Intention for Referenced

12/11/00 (revised 01/04/00 with item #6 added)

The two parties named herein have mutual cause to enter into agreement for the development of a specialized antenna to be used in the cellular phone industry.

The names and addresses are:

| | |
|---|---|
| James R. Johnson | Dr. Steven L. Myers |
| 13 Horten Court | Myers Engineering Inc. |
| Pleasant Hill, CA, 94523 | Fort Lauderdale, Florida |
| 650 595 8888 | 954 345 5000 ext. 101 |

Jim Johnson, having contacted Myers Engineering to contract for the development of a unique directional antenna for use in the hearing impaired and other markets deeming appropriate, and Dr. Steven Myers having agreed to support this project have mutually agreed to enter into a general developmental and marketing agreement under the terms below:

1. Jim Johnson has contracted Myers Engineering to develop the concept and design of the Interferometric Array (new antenna) for cellular devices for Lo Sar (a new start up company with name to be determined). Contract fee for initial concept development and patent write up is $2,000. Additional funds shall be required to develop prototype(s) and additional iterations and revisions of the initial product. The first product I.D. shall be referred to as IAA revision A1.

2. Jim Johnson and team will provide the capital, manufacturing designs and marketing for continued development and sale of the new antenna.

3. The new antenna will be available to patent and Jim Johnson and Dr. Myers will be equal owners of the patent as evidenced by both names on the developmental documentation.

4. Marketing of the product will be granted to Jim Johnson's new company as well other companies as appropriate and agreed by both parties.

5. Licensing fees, royalties and other benefits arriving out of the development of this antenna will be paid and enjoyed equally to both patent holders. Said fees and benefits shall be set by reasonable comparisons under regular market conditions as agreed and approved by both parties. Details and specifics will be developed as appropriate. The goal for income from royalties is around 10% of cost of manufacturing or an amount not less than $1 for each antenna sold which ever is higher. The goal of the cost of manufacturing will be less than $10 with an end user price of $69 after distribution costs and profits.

6. This agreement will be governed and construed in accordance with the laws of the State of Florida.

Agreement to this is made evident by signature and delivery by fax.

James R. Johnson                    Myers Engineering Inc.


                                    Dr. Steven L. Myers


Signed:_____ Date_____    Signed:_____ Date_____

James R Johnson