**E-Filed 9/30/2011**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAMES R. JOHNSON, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>STEVEN L. MYERS, et al.,<br><br>　　　　　　Defendants. | Case No. CV-11-00092 JF (PSG)<br><br>ORDER[1] GRANTING DEFENDANTS' MOTION TO DISMISS<br><br>[Re: Docket No. 9] |

　　The nineteen plaintiffs in this case were shareholders of a now-dissolved Scottish company known as Vortis Technology, Ltd. They assert numerous claims against Steven L. Myers, a former director of Vortis, and Myers Engineering International, Inc ("MEI"), a company solely or principally owned by Myers. Defendants move to dismiss Plaintiffs' complaint on both jurisdictional and substantive grounds. For the reasons discussed below, the motion will be granted with leave to amend as to Plaintiffs' breach-of-contract claim and without leave to amend as to all other claims.

## I. BACKGROUND

　　According to the complaint, Myers and Plaintiff James R. Johnson co-founded a

---

[1] This disposition is not designated for publication in the official reports.

Case No. CV-11-00092 JF (PSG)
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
(JFLC3)

California corporation called Myers Johnson, Inc. ("MJI"). MJI focused on developing an Interferometric Antenna Array Technology for cellular telephones ("the Technology"). From 2003 to 2005, MJI raised money to develop the Technology. In 2004, Myers and MJI entered into a Technology Assignment Agreement ("TAA"), pursuant to which Myers agreed to contribute $12,500 to MJI, assign his intellectual property interests in the Technology to MJI, and undertake various responsibilities to assist MJI with the Technology. In exchange, Myers received stock in MJI. In 2005, the United States Patent and Trademark Office awarded a patent for aspects of the Technology to Myers and Johnson, with MJI as the assignee. In February 2005, MJI issued a product release for an antenna product based on the Technology.

At some point during 2005, the shareholders of MJI—including Johnson and the eighteen other named plaintiffs—entered into a Stock Purchase Agreement with Vortis, which was organized under the laws of Great Britain. Pursuant to the Stock Purchase Agreement, Vortis purchased all the stock of MJI, and MJI became a wholly-owned subsidiary of Vortis. The shareholders of MJI exchanged their shares in MJI for shares of Vortis. Vortis became the assignee of the Technology and the owner of all of MJI's other assets, including the TAA.

At various times from 2005 to 2007, Myers sat on the Board of Directors and held high-level management or officer positions at Vortis. From 2006 to 2007, Myers's associate Stephen Burke also served on Vortis's Board of Directors. Myers and Burke worked together closely and essentially controlled the daily affairs of Vortis from 2006 to 2007. Myers was primarily responsible for developing the Technology so that it would be commercially marketable as soon as possible. The Technology was Vortis's only product, and Plaintiffs invested significant sums of time and money in Vortis in reliance upon Myers's representations that the Technology eventually would be very profitable.

Myers soon became "remiss" in developing the Technology and represented to Plaintiffs that Vortis was insolvent. On or about May 23, 2007, Vortis's Board of Directors held a meeting in Glasgow, Scotland. According to the unsigned minutes of that meeting, the only person present was Burke, who listed himself as the "Sole Director." The "Board of Directors" declared Vortis insolvent and resolved to wind up Vortis as soon as possible. Myers and Burke initiated a

liquidation proceeding in the British Court of Session, and the Court appointed joint liquidators from the accounting firm Begbies Traynor LLP.[2]

After initiating the liquidation proceeding, Myers and Burke represented in financial documents that the value of the Technology was "uncertain;" that Vortis was approximately £1.811 million in debt; that Vortis's largest creditor was MEI, the Florida corporation that Myers solely or principally owns; and that Vortis's second-largest creditor was Myers himself. During the liquidation proceedings, Myers arranged for a "sealed and essentially secret" auction to sell the Technology. The auction was not well-publicized, and there was no official or qualified appraisal of the value of the Technology before the auction. Myers or Burke instructed the joint liquidators to accept Myers and MEI's offer of £12,000 for the Technology. This sum allegedly represents less than 1% of the actual market value of the Technology. On January 15, 2008, the joint liquidators notified Plaintiffs that Myers and MEI had purchased the Technology at the auction.

Plaintiffs filed the present action against Myers and MEI on January 7, 2011. They assert claims for (1) breach of fiduciary duty; (2) misrepresentation and concealment; (3) fraudulent misrepresentation and concealment; (4) negligence; (5) breach of contract; (6) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and (7) conversion.[3] Johnson and thirteen other plaintiffs reside in California. Two plaintiffs reside in Vermont, two reside in New Mexico, and one resides in New York. Myers resides in Florida.

Myers and MEI move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction), 12(b)(2) (lack of personal jurisdiction), 12(b)(6) (failure to state a

---

[2] A liquidation proceeding under British law is similar to a bankruptcy proceeding under United States law. The purpose of a liquidation proceeding is to pay off a corporation's debts, liquidate its assets, and dissolve the corporation.

[3] Plaintiffs also assert three other "claims" that more appropriately are characterized as requests for relief: (1) cancellation of the sale of and return of all rights and interests in the Technology to Plaintiffs, (2) return of all ownership and control of the Technology to the Plaintiffs, and (3) injunctive relief preventing Myers and MEI from using or profiting from the Technology and requiring Myers and MEI to provide an accounting of all revenues and expenses arising from the their use of the Technology.

claim), 12(b)(3) (improper venue), and on the basis of forum non conveniens.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction, possessing only that power authorized by Article III of the United States Constitution and statutes enacted by Congress pursuant thereto. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). Federal courts have no power to consider claims for which they lack subject-matter jurisdiction, and a court is under a continuing duty to dismiss an action whenever it appears that it lacks jurisdiction. *Id.*; *see also Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir. 2003); *Attorneys Trust v. Videotape Computers Prods., Inc.*, 93 F.3d 593, 594-95 (9th Cir. 1996). The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists when challenged under Fed. R. Civ. P. 12(b)(1). *See Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001). The defendant may challenge jurisdiction either on the face of the complaint or by providing extrinsic evidence demonstrating lack of jurisdiction on the facts of the case. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Where the defendant challenges jurisdiction solely as a matter of law, all allegations of the complaint are taken as true and all disputed issues of fact are resolved in favor of the non-moving party. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1990).

#### 1. Amount in Controversy

Plaintiffs assert federal jurisdiction based upon the parties' diversity of citizenship. *See Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1068 (9th Cir. 2005) ("In civil cases, subject matter jurisdiction generally is conferred upon federal district courts either through diversity jurisdiction, 28 U.S.C. § 1332, or federal question jurisdiction, 28 U.S.C. § 1331."). Diversity jurisdiction requires that the parties be in complete diversity—i.e., all plaintiffs must have citizenship different from that of all defendants—and the amount in controversy exceed $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). Here, Defendants do not dispute Plaintiffs' representation that there is complete diversity: all of the plaintiffs are citizens of states other than Florida, while Myers and MEI are citizens of Florida.

4

However, Defendants argue that Plaintiffs fail to meet the amount-in-controversy requirement because they have not alleged that they *each* have claims worth at least $75,000. Defendants point out that even if Plaintiffs are correct in valuing the Technology at £1.2 million, which converts to approximately $2.4 million,[4] they have not specified the percentage stake that each of them held in Vortis, making it impossible to determine each plaintiff's proportionate share of any recovery.

Generally, "separate and distinct claims [can]not be aggregated to meet the required jurisdictional amount." *Snyder v. Harris*, 394 U.S. 332, 336 (1969). Aggregation of claims to meet the jurisdictional amount is permissible, however, "'in cases in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest.'" *Gibson v. Chrysler Corp.*, 261 F.3d 927, 943 (9th Cir. 2001) (quoting *Snyder*, 394 U.S. at 335); *see also Eagle v. Am. Tel. and Tel. Co.*, 769 F.2d 541, 545 (9th Cir. 1985). Although the "distinction between 'separate and distinct' claims which cannot be aggregated, and 'common and undivided' claims which can, is not always crystal-clear," *Gibson*, 261 F.3d at 944, it is evident that the claims in this case are of the latter type. The Ninth Circuit's decision in *Eagle* is instructive. In that case, the plaintiffs were former shareholders in a company that they alleged had breached its fiduciary duty, causing the value of their shares to decline. The court observed that "[u]nder California law, the source of the shareholders' claim for the wrongful depletion of corporate assets is the common and undivided interest each shareholder has in a corporation's assets and a right to share in the dividends." *Eagle*, 769 F.2d at 546. It concluded that the claims "must be characterized as common and undivided" and that the amount of compensatory damages the plaintiffs collectively sought, $38 million, satisfied the amount-in-controversy requirement for diversity jurisdiction. *Id.* at 547. Similarly, the claims here involve the allegedly wrongful sale of a corporate asset. Like the plaintiffs in *Eagle*, Plaintiffs have a common and undivided interest, and the value of their claims properly may be

---

[4] In 2007, the value of the British pound in U.S. Dollars ranged from approximately $1.92 to $2.05. *See* Federal Reserve, Historical Rates for the UK Pound, http://www.federalreserve.gov/releases/h10/hist/dat00_uk.htm (last visited Sept. 26, 2011).

1  aggregated. Because they have alleged that the Technology was worth about £1.2 million and
2  wrongfully was sold for less than 1% of this amount, Plaintiffs meet the amount-in-controversy
3  requirement for diversity jurisdiction.

### 2. Article III Standing

Defendants also argue that this Court lacks subject-matter jurisdiction because Plaintiffs lack standing to bring claims based upon financial harm to Vortis. While their arguments have some substantive merit, as will be discussed later, Defendants confuse Article III standing and prudential standing. Article III standing is a necessary component of subject-matter jurisdiction. *Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc.*, No. 10-60004, ___ F.3d ___, 2011 U.S. App. LEXIS 15907, at *8 (9th Cir. Aug. 3, 2011). To have Article III standing, a plaintiff must show that "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). Prudential standing, on the other hand, is a "non-constitutional, nonjurisdictional, policy-based limitation[] on the availability of judicial review." *Mulhall v. Unite Here Local* 355, 618 F.3d 1279, 1290 (11th Cir. 2010). The doctrine of prudential standing requires a court to consider "whether the alleged injury is more than a mere generalized grievance, whether the plaintiff is asserting her own rights or the rights of third parties, and whether the claim falls within the zone of interests to be protected or regulated by the" constitutional or statutory guarantee in question. *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010) (internal quotation marks and citations omitted).

Defendants argue that Plaintiffs' alleged injuries in fact were injuries to Vortis, not to the company's individual former shareholders, and that Plaintiffs have not met the legal requirements for bringing a derivative action on behalf of Vortis. These arguments pertain to prudential rather than constitutional standing. In *Franchise Tax Board of California v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990), the Supreme Court explained that shareholders in two companies had Article III standing to challenge taxes assessed against those companies because

6

the taxes "threaten[ed] to cause actual financial injury" to the shareholders by "reducing the return on their investments" and "lowering the value of their stockholdings."  Presenting a separate issue of prudential standing was the question of whether the "shareholder standing rule"—"a long-standing equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same actions for reasons other than good-faith business judgment"—barred the plaintiffs' suit.  *Id.*  The Ninth Circuit similarly has observed that doubts about whether a shareholder has been authorized to sue on behalf of a corporation do not implicate a court's subject-matter jurisdiction.  *See Crusaders Prods., Inc. v. Henderson*, Nos. 99-55442, 99-55759, 2000 U.S. App. LEXIS 26002, at *2 (9th Cir. Oct. 12, 2000) ("Felder argues that the district court lacked jurisdiction because Felder, a fifty percent shareholder in CPI, did not authorize CPI to institute this suit.  Although Felder uses the word 'standing,' this is actually an authority to sue defense, not a bar to the district court's exercise of jurisdiction." (citing *De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 878 n.4 (9th Cir. 2000), *cert. denied*, 531 U.S. 876 (2000))).  Here, the alleged financial harm to Vortis is alleged to have resulted in financial harm to the company's shareholders, and Plaintiffs have Article III standing.  The separate question of Plaintiffs' right to sue on behalf of Vortis is addressed in the discussion of Defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6).  *See Arakaki v. Lingle*, 477 F.3d 1048, 1056 (9th Cir. 2007) (indicating that Rule 12(b)(1) should be invoked for dismissal on jurisdictional grounds, while Rule 12(b)(6) should be invoked for dismissal on prudential grounds); *Hull v. IRS*, No. 10-1410, ___ F.3d ___, 2011 U.S. App. LEXIS 18083, at *23-24 n.5 (10th Cir. Aug. 31, 2011) ("Courts generally dismiss suits on prudential grounds pursuant to Rule 12(b)(6) for failure to state a claim rather than Rule 12(b)(1) for lack of subject matter jurisdiction.").

**B. Personal Jurisdiction**

When a nonresident defendant raises a challenge to personal jurisdiction, the plaintiff bears the burden of showing that jurisdiction is proper.  *See Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 839 (9th Cir. 1986).  In the context of a motion to dismiss based upon pleadings and affidavits, the plaintiff may meet this burden by making a prima facie showing of

personal jurisdiction. *See Metro. Life Ins. v. Neaves*, 912 F.2d 1062, 1064 n.1 (9th Cir. 1990). The plaintiff "need only demonstrate facts that if true would support jurisdiction over the defendant," and "conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor for the purposes of deciding whether a prima facie case for personal jurisdiction exists." *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003) (internal quotation marks and citations omitted).

Because no federal statute governs personal jurisdiction, the Court applies the law of the forum state. *See Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 608-09 (9th Cir. 2010). California's long-arm statute is co-extensive with federal due process requirements. *Id.* at 609. "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Personal jurisdiction over each defendant must be analyzed separately." *Harris Rutsky & Co.*, 328 F.3d at 1130.

There are two forms of personal jurisdiction that a forum state may exercise over a nonresident defendant: general jurisdiction and specific jurisdiction. *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). Plaintiffs argue that this Court has specific jurisdiction over Defendants, which requires that

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Id.*

### 1. Purposeful Direction/Availment

The first prong of the test may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof. *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir.

2006) (en banc). The Ninth Circuit has treated this prong "somewhat differently in tort and contract cases." *Id.* In contract cases, a court "typically inquire[s] whether a defendant 'purposefully avails itself of the privilege of conducting activities' or 'consummate[s] [a] transaction' in the forum, focusing on activities such as delivering goods or executing a contract." *Id.* (quoting *Schwarzenegger*, 374 F.3d at 802). With respect to Plaintiffs' breach-of-contract claim here, it is evident that Myers purposefully availed himself of the privilege of doing business in California when he entered into the TAA with MJI. The TAA indicates that MJI was a California corporation, with an address at 1275 Columbus Avenue in San Francisco, California. Dkt. 20, Exh. A. The TAA established an ongoing relationship between Myers and MJI, requiring Myers to assist MJI in "legal ways to evidence, record and perfect" the assignment of rights in the Technology and to "deliver to [MJI] working prototypes of the Vortis antenna suitable for manufacturing and reproducible results." *Id*. §§ 4.1, 6.1. This is sufficient to constitute purposeful availment of the privilege of doing business in California. *See Boschetto*, 539 F.3d at 1017 (the "lone transaction for the sale of one item" in a forum state is not enough to establish personal jurisdiction, but there is purposeful availment if "business activities . . . create continuing relationships and obligations" in a forum state). Thus, for purposes of claims arising out of the TAA, this Court has personal jurisdiction over Myers.

The same cannot be said, however, with respect to MEI. The complaint does not allege that MEI was involved in the formation of the TAA, and there are no references to MEI anywhere in that document. The breach-of-contract claim therefore will be dismissed as to MEI for lack of personal jurisdiction, with leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (A "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." (internal quotation marks and citation omitted)).

In tort cases, a court "typically inquire[s] whether a defendant 'purposefully direct[s] his activities' at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc.*, 422 F.3d at 1206 (internal citations omitted). "The 'effects' test—derived from the

Case No. CV-11-00092 JF
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984)—may be satisfied if the defendant is alleged to have (1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." *Harris Rutsky & Co.*, 328 F.3d at 1131. With respect to all of Plaintiffs' non-contractual claims in this case, it is evident that Myers and MEI both meet the test. Myers's alleged wrong of failing to develop the Technology and then causing Vortis to sell it at a steep discount to himself and MEI were intentional acts directed at Vortis's shareholders. Given Myers's roles as a co-owner of MJI and later a director and manager of Vortis, it may be inferred that Myers knew that most of Vortis's shareholders resided in California. Indeed, as part of their interrogatory responses, Myers and MJI disclosed a list of Vortis shareholders as of April 2007. According to this list, approximately twenty-four Vortis shareholders, constituting all but three of the company's shareholders with identified addresses, lived in California. *See* Dkt. 19 at Exh. A to Interrogatory Responses. There is a reasonable inference that Myers and MEI expressly aimed their activities at California and should have known that the brunt of the alleged harm would be felt here. *See Bancroft & Masters v. Augusta Nat'l*, 223 F.3d 1082, 1087 (9th Cir. 2000) (Express aiming requirement "is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.").

### 2. Arising out of or Relating to the Defendants' Forum-Related Activities; Reasonableness

Plaintiffs' tort claims clearly arise out of Myers's and MEI's California-related activities. Once a court has found that a defendant purposefully established minimum contacts with a forum, the defendant "'must present a compelling case that . . . other considerations would render jurisdiction unreasonable'" in order to defeat personal jurisdiction. *Harris Rutsky & Co.*, 328 F.3d at 1131 (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)). In assessing reasonableness, the court weighs a number of factors: (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state;

1  (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution
2  of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and
3  effective relief; and (7) the existence of an alternative forum. *Id.* Myers's burden of traveling
4  from Florida to California to defend this case is not compelling given the business ties that he
5  has had with California in the past. Nor have Defendants explained why any other factors make
6  it unreasonable for a California court to exercise jurisdiction over them. Accordingly, the Court
7  concludes that it has personal jurisdiction over Myers (but not MEI) with respect to the breach-
8  of-contract claim, and over both Defendants with respect to all of Plaintiffs' other claims.

**C. Forum Non Conveniens**

"A party moving to dismiss on grounds of forum non conveniens must show two things: (1) the existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal. This showing must overcome the 'great deference . . . due plaintiffs because a showing of convenience by a party who has sued in his home forum will usually outweigh the inconvenience the defendant may have shown.' Private interest factors include '(1) relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of hostile witnesses, and cost of obtaining attendance of willing witnesses; (3) possibility of viewing subject premises; (4) all other factors that render trial of the case expeditious and inexpensive.' Public interest factors include '(1) administrative difficulties flowing from court congestion; (2) imposition of jury duty on the people of a community that has no relation to the litigation; (3) local interest in having localized controversies decided at home; (4) the interest in having a diversity case tried in a forum familiar with the law that governs the action; (5) the avoidance of unnecessary problems in conflicts of law.'" *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009) (internal citations omitted).

Plaintiffs do not dispute Defendants' contention that Scotland is an adequate alternative forum. *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1144 (9th Cir. 2001) (A "foreign forum will be deemed adequate unless it offers no practical remedy for the plaintiff's complained of wrong."). Nonetheless, Plaintiffs' choice of a California forum over Scotland is entitled to deference: the United States is the home forum of all the plaintiffs, and California in particular is

home to most of the plaintiffs. The private factors tilt in Plaintiffs' favor. As Plaintiffs point out, the sources of proof consist mostly of documents that are accessible to Myers and many of which have been produced by Myers. The nature of Plaintiffs' claims is such that visits to physical sites in Scotland likely are unnecessary. Defendants make much of the fact that key witnesses, such as Myers's co-director Stephen Burke, other Vortis executives, and the joint liquidators, reside in Scotland. But they have not asserted that any of these witnesses would be unwilling to testify in California, and the Ninth Circuit recently has embraced the principle that "[w]hen no witness' unwillingness has been alleged or shown, a district court should not attach much weight to the compulsory process factor." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1231 (9th Cir. 2011) (quoting *Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006)). Overall, it appears more expeditious and inexpensive to litigate this action in California, which is physically closer to Myers's residence than Scotland is and which is where most of the plaintiffs reside.

As to the public interest factors, Defendants are silent about the relative congestion of California and British courts. With respect to community interests, Defendants have stated—and Plaintiffs have not disputed—that the Scottish Enterprise fund, an entity of the Scottish government, was an investor in Vortis. This fact is counterbalanced, however, by the fact that most of Vortis's shareholders were California residents. As discussed below, Defendants are correct that British law governs most of Plaintiffs' claims, but the advantage of having a British court apply British law is diminished in this case because the relevant legal principles and their application to the facts are not particularly complex. On the whole, then, the public interest factors weigh at most only slightly in Defendants' favor.

**D. Failure to State a Claim**

    **1. Choice of Law**

When a federal court sits in diversity, it looks to the forum state's choice of law rules to determine the controlling substantive law. *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). California has adopted the "internal affairs doctrine," which requires a court to apply the law of the state of incorporation to those things identified as internal affairs of a corporation. *Becher v.*

12

*Nw. Mut. Life Ins. Co.*, No. CV 10-6264 PSG (AGRx), 2010 U.S. Dist. LEXIS 135854, at *10 (C.D. Cal. Dec. 9, 2010) (citing *State Farm Mut. Auto. Ins. Co v. Superior Court*, 114 Cal. App. 4th 434, 442 (2003)); *Vaughn v. LJ Int'l, Inc.*, 174 Cal. App. 4th 213, 223 (2009). Plaintiffs' claims for misrepresentation and concealment, fraudulent misrepresentation and concealment, negligence, unfair competition, and conversion, are based upon Myers's activities as a director or manager of Vortis and concern the internal affairs of Vortis, which was incorporated in Great Britain. British law thus is applicable to those claims.[5]

Plaintiffs' breach-of-contract claim presents a more difficult question. If the TAA did not contain a choice-of-law clause, the breach-of-contract claim also likely would be governed by the internal affairs doctrine. The claim is based upon the TAA between Myers and MJI, and MJI subsequently assigned its rights under that agreement to Vortis. Plaintiffs' theory is that Myers breached the TAA by failing to develop the Technology while he was a director and manager of Vortis. The claim therefore concerns the internal affairs of Vortis, even though it is characterized as a breach of contract. *See In re VeriSign, Inc.*, 531 F. Supp. 2d 1173, 1215 (N.D. Cal. 2007) (applying internal affairs doctrine to shareholders' claims, including a breach-of-contract claim).

However, Plaintiffs argue persuasively that the Court should apply the choice-of-law clause in the TAA, which states that the TAA "shall be construed pursuant to the laws of the State of California and the United States without regard to conflicts of law provisions thereof." Dkt. 20, Exh. A § 10. In cases in which the parties have made choice-of-law arguments based upon both contractual clauses and the internal affairs doctrine, the Ninth Circuit (applying California law) and the California Supreme Court both have analyzed the choice-of-law clauses

---

[5] Plaintiffs argue that applying the internal affairs doctrine would violate California public policy because California has an "overriding interest in protecting its citizens from individuals who commit torts and breaches of contract in California." Dkt. 18 at 11. However, internal wrongdoing within a corporation often results in harm to shareholders who are spread out among different jurisdictions. If the presence of California shareholders were enough to discard the internal affairs doctrine on public policy grounds, the doctrine would have little practical effect.

before the internal affairs doctrine. *See Batchelder v. Nobuhiko Kawamoto*, 147 F.3d 915, 918-20 (9th Cir. 1998); *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464-71 (1992). To be sure, in those cases both considerations ultimately pointed to the same result, so there was no true conflict. *See Batchelder*, 147 F.3d at 920 ("[E]ven if we were to ignore the . . . Agreement's choice-of-law provision, [the internal affairs doctrine] would direct" the same result); *Nedlloyd Lines B.V.*, 3 Cal. 4th at 471 ("[E]ven in the absence of a choice-of-law clause, Hong Kong's overriding interest in the internal affairs of corporations domiciled there would in most cases require application of its law."). Still, *Batchelder* and *Nedlloyd* indicate strong presumptions in favor enforcing contractual choice-of-law provisions. *See Batchelder*, 147 F.3d at 918 ("Contractual choice-of-law clauses are routinely enforced, particularly when the country whose law is selected has some nexus with the action."); *Nedlloyd Lines B.V.*, 3 Cal. 4th at 464-65 ("California courts shall apply . . . a strong policy favoring enforcement" of choice-of-law clauses.).

Moreover, California law has disfavored the internal affairs doctrine in circumstances not dissimilar to those present here. *See In re VeriSign, Inc.*, 531 F. Supp. 2d at 1215 n.20 ("California makes an exception to the internal affairs doctrine where shares of the foreign corporation are not listed or traded on a national exchange, and where more than one-half of the outstanding voting shares are held by California residents." (citing Cal. Corp. Code § 2115)); *State Farm Mut. Auto. Ins. Co.*, 114 Cal. App. 4th at 447 ("[I]n the management and method of its business affairs in California with the citizens and residents thereof, in the sale or disposition or transfer of the shares of stock, [a foreign corporation] must conform to the [securities regulations] of California . . . ." (citing *W. Air Lines, Inc. v. Sobieski*, 191 Cal. App. 2d 399, 409 (1961))).

For these reasons, the Court concludes that the choice-of-law clause takes precedence over the internal affairs doctrine, although it is aware that at least one court has taken the opposite approach. *See Rosenmiller v. Bordes*, 607 A.2d 465, 469 (Del. Ch. 1991) (applying Delaware law pursuant to the internal affairs doctrine despite a choice-of-law clause in the stockholder agreement at issue providing for the application of New Jersey law). To summarize,

14

California law will be applied to the breach-of-contract claim, and British law will be applied to the other claims. The choice of law affects the disposition of the defendants' 12(b)(6) motion, because California law and British law differ with respect to the circumstances under which shareholders may assert claims on behalf of a corporation.

### 2. Plaintiffs' Claims are Derivative Claims

Before going further, it is necessary to determine whether Plaintiffs' claims are derivative at all. Plaintiffs argue that their claims are not derivative because Vortis "has been liquidated, dissolved, and is no longer in existence," and "[w]ithout a corporation that is viable and active, there can be no shareholder derivative lawsuit." Dkt. 18 at 9. However, Plaintiffs cite no authority to support their assertion that individual shareholders inherit claims belonging to a corporation when the corporation is dissolved. The dissolution of Vortis does not change the fact that all of the claims Plaintiffs assert here belong to Vortis: Vortis was the assignee of the TAA, and the Technology was Vortis's asset. Plaintiffs' claims arising out of the TAA and Myers's management of Vortis clearly are derivative, and in order to pursue those claims, Plaintiffs must show that the relevant prudential standing rules permit them to bring claims on behalf of Vortis.

### 3. Derivative Claims under British Law

Defendants argue that the British common law rule of *Foss v. Harbottle* (1843) 2 Hare 461, which narrowly limits the circumstances under which shareholders may bring derivative suits, bars Plaintiffs' claims.[6] In fact, an even harsher bar applies because Vortis has been

---

[6] *Foss v. Harbottle* holds that a shareholder may not bring a derivative action on behalf of a company for wrongs that are capable of ratification by a majority of shareholders unless one of three exceptions applies: (1) the alleged wrong is ultra vires, (2) the validity of the transaction is dependent upon approval by a majority of shareholders greater than a simple majority, or (3) there was fraud on the minority, i.e., the wrongdoers who profited at the expense of the company through self-dealing were in voting control of the company. *See In re BP p.l.c. Derivative Litig.*, 507 F.Supp.2d 302, 311 (S.D.N.Y. 2007); *see also City of Harper Woods Emps. Ret. Sys. v. Olver*, 577 F.Supp.2d 124, 131-32 (D.D.C. 2008). The Companies Act of 2006 altered the requirements for shareholder standing, but the Act does not apply to claims that "arise[] from acts or omissions that occurred before 1st October 2007." The Companies Act 2006, S.I. 2007/2194 Art. 9, Schedule 3, ¶ 20(3); *see also City of Harper Woods*, 577 F.Supp.2d at 136-37;

15

dissolved. Under British law, "Once a company has been dissolved or ceased to exist, a derivative claim cannot be brought on its behalf." VICTOR JOFFE QC ET AL., MINORITY SHAREHOLDERS: LAW, PRACTICE AND PROCEDURE ¶ 1.32 (3d ed. 2008) (citing *Clarkson v. Davies* [1923] AC 100). Plaintiffs thus were required to seek remedy for the wrongs they have alleged through the liquidator during the liquidation proceedings. As the British Law Commission explains,

> The derivative action is "... a form of pleading originally introduced on the ground of necessity alone in order to prevent a wrong going without redress". Where a company has gone into liquidation, there is no need for such a device as the liquidator, an independent third party, will have taken control of the company's affairs from the alleged wrongdoers. If there is a reasonable cause of action against the wrongdoers, *the liquidator can cause the company to bring an action and, if the liquidator refuses, the complainant shareholder may be able to obtain either an order directing the liquidator to bring such an action or an order allowing the shareholder to bring an action in the name of the company*.

THE LAW COMMISSION, SHAREHOLDER REMEDIES CONSULTATION PAPER NO. 142 ¶ 5.20 (1996), *available at* http://www.justice.gov.uk/lawcommission/areas/shareholder-remedies.htm (emphasis added). [7]

### 4. Derivative Claims under California Law

---

*In re BP*, 507 F.Supp.2d at 311.

[7] *See also* JOFFE, MINORITY SHAREHOLDERS ¶¶ 1.30-1.31 ("When a company is in liquidation, a derivative claim cannot be brought by a minority shareholder. . . . . The courses open to the minority shareholder are: a. to ask the liquidator to bring the proceedings. . . . or b. if the liquidator refuses to bring or seeks to impose unreasonable terms for bringing the proceedings, to apply to the court under the Insolvency Act 1986 (IA 1986) s 112(1) or s 168(5) for an order that the liquidator bring the action in the name of the company, or that the minority shareholder be permitted to bring the action in the name of the company . . . ."); JONATHAN FISHER QC ET AL., THE LAW OF INVESTOR PROTECTION ¶ 29-046 (2d ed. 2003) ("Once a company is in liquidation, redress must be sought from the liquidator . . . ."); XIAONING LI, A COMPARATIVE STUDY OF SHAREHOLDERS' DERIVATIVE ACTIONS: ENGLAND, THE UNITED STATES, GERMANY AND CHINA 72 (2007) ("Where a company is in liquidation, the liquidator will take control of the company's affairs away from the board and the shareholders. . . . A shareholder may ask the liquidator to bring an action against the wrongdoer. If the liquidator refuses, the shareholder may obtain an order from the court asking the liquidator to bring such an action according to sections 112(1) or 168(5) of the Insolvency Act 1986, or may obtain an order permitting the shareholder to bring the action in the name of the company.").

Case No. CV-11-00092 JF
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

Plaintiffs' only remaining claim is their breach-of-contract claim. As explained above, this claim is derivative because the contractual rights under the TAA belong to Vortis, not the individual shareholders. Because the Court has concluded that California law governs this particular claim, Plaintiffs are subject to the shareholder standing requirements for bringing a derivative suit under California law. Section 800 of the California Corporations Code states in relevant part:

> (b) No action may be instituted or maintained in right of any domestic or foreign corporation by any holder of shares . . . of the corporation unless both of the following conditions exist:
> (1) The plaintiff alleges in the complaint that plaintiff was a shareholder . . . at the time of the transaction or any part thereof of which plaintiff complains . . . and
> (2) The plaintiff alleges in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and alleges further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file.

It is clear from the complaint that Plaintiffs were shareholders at the time of Myers's allegedly wrongful activities. However, the complaint does not contain any allegations with respect to Plaintiffs' efforts to persuade the board to take action as required by Cal. Corp. Code § 800(b)(2). Accordingly, the breach-of-contract claim is subject to dismissal, with leave to amend.

**E. Venue**

If Plaintiffs file an amended complaint asserting their breach-of-contract claim, they will also need to cure the shortcomings of the present complaint with respect to venue. A civil action based upon diversity jurisdiction may be brought

> only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Plaintiffs seek venue in the Northern District of California under § 1391(a)(2), but they have not shown that a "substantial part" of the events giving rise to the

breach-of-contract claim occurred here.  The complaint merely makes the conclusory allegation that "some of the acts, conduct, or omissions of the Defendants alleged herein occurred in the Northern District of California."[8]  The TAA lists MJI's address as 1275 Columbus Avenue, San Francisco, California, but this fact alone does not amount to a "substantial part" of the events giving rise to the claim.  And even if substantial events did occur in San Francisco, such facts would appear to require reassignment of this case to the San Francisco Division or Oakland Division of this Court rather than the San Jose Division.  *See* Civil L.R. 3-2(d) (With exceptions not relevant here, "all civil actions which arise in the counties of Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Napa, San Francisco, San Mateo or Sonoma shall be assigned to the San Francisco Division or the Oakland Division.").  At oral argument, Plaintiffs claimed that they could amend their complaint to provide additional facts showing why venue is proper here.

### IV.  ORDER

Defendants' motion to dismiss is GRANTED with leave to amend as to Plaintiffs' claim for breach of contract and without leave to amend as to all other claims.

IT IS SO ORDERED.

DATED: September 30, 2011

_____
JEREMY FOGEL
United States District Judge

---

[8]  The complaint also alleges that venue is appropriate here because "some of the Plaintiffs reside in the Northern District of California," but this is not a relevant consideration to determining venue.  *See* 28 U.S.C. § 1391(a); *Berube v. Brister*, 140 F.R.D. 258, 260 n.12 (D.R.I. 1991) ("Congress clearly removed the plaintiffs' residence venue option from diversity cases in the 1990 amendments.").